GRAY, MACMURDO & CO. *v.* LOWE, PATTISON & CO. et al. LOWE AND PATTISON *v.* W. B. PARTEE & CO. AND GRAY, MACMURDO & CO.

Ambiguous or obscure clauses in the contract of sale, are interpreted against the seller, who is bound to explain himself clearly as to the extent of his obligations. Code, 2449.

Where, under two contracts, the purchaser bought two parcels of drafts, his right to one of the drafts being afterwards questioned, it was held, that his failure to establish by which of the contracts he obtained the draft, did not invalidate his title, where it was clear that he had obtained it under one or the other of the contracts.

The sale of a draft, with a privilege reserved to redeem it within a certain time, is valid.

APPEAL from the Fifth District Court of New Orleans, *Buchanan* J. *Elmore* and *King*, for appellants. *A. N. Ogden*, for appellees.

By the court:

EUSTIS, C. J. The manner in which this case is presented to the court, it is immaterial to state or consider. It turns exclusively on the decision of the point on which the district judge decided it. It is thus stated by him:

"Did *Gray, Macmurdo & Co.* acquire the draft sued on, from *W. B. Partee & Co.*, in full ownership, or was it placed in the hands of the former, by the latter, as collateral security for the repayment of a loan? If the former be the fact, the contract, as to the draft, was a sale; if the latter, a pledge."

The article 3125 of the code, provided, that in order to give effect to a pawn of movables, against third persons, the contract must be by authentic act, or under private signature, recorded before a notary, besides requiring certain other matters of form, in order to give it validity. This article was extended to promissory notes. Art. 3225.

These articles prevented the circulation and use of negotiable paper, by way of pledge or security, and limited its negotiability to cases of sale or discount, in which the property in the paper was absolutely transferred, unless the forms, required by the code, were observed in the contract. These forms, men of business, in their transactions, had neither time nor inclination to observe, and the consequence was, of necessity, a resort to some other legal mode, in which negotiable paper could be made available for the ordinary purposes of trade and exchange. Hence, for the purpose of raising money on a note, which was not to be transferred absolutely, it was sold with a privilege reserved by the owner to redeem it within a certain time.

These articles of the code, after having long been a most serious incumbrance to commerce, were, by common consent, repealed at the last session of the Legislature.

The transactions which give rise to this case, took place before the repeal of those articles, which are to regulate the rights of the respective parties, and the question is stated, whether the facts constitute a pledge or a sale of the draft of $5000.

*Greenland* acted as the agent of *Partee & Co.*, and *Bell* as the agent of *Gray, Macmurdo & Co.* The testimony of both was taken at great length, and under a very scrutinizing cross-examination.

*Greenland*, a witness for *Lowe* and *Pattison*, gives this account of the business: "In the months of August and September, in the first instance, in August, on the part of *W. B. Partee & Co.*, having been appointed as the person to attend to their business, it became necessary from time to time to raise money; amongst other persons, application was made to *Messrs. Gray, Macmurdo & Co.*, and in the first transaction we had with them, we received an amount of money, I think, about $7000, as near as my memory serves me; for this $7000, we agreed to sell a certain amount of paper, reserving the right of repurchasing this paper at a stipulated price on a given day; several transactions of this kind took place between the middle of August and the middle of September; we had always repurchased the paper at the stated price, on or about the given day, except in two instances; in consequence of the embarrassment of the firm of *Partee & Co.*, it became impracticable to repurchase the paper, and that paper is now held, or was held, by *Messrs. Gray, Macmurdo & Co.*; there was no paper signed in the two last transactions with *Gray, Macmurdo & Co.*, and I believe, in those transactions, the paper sued on in this case was included; when I gave the draft of $5000 in question, I think it was given to *Mr. Bell;* there was no written agreement made, and I do not, at this time, recollect any conversation in regard to it; the draft sued on, was given to *Gray, Macmurdo & Co.*, on the same terms and conditions that other paper had been given to them; that is, that *W. B. Partee & Co.*, had the privilege of repurchasing the same by a given day; the mode in which these negotiations were made was this: A certain amount was received from *Messrs. Gray, Macmurdo & Co.*, for which a certain amount of paper was transferred to them; they agreed that *W. B. Partee & Co.*, should have the privilege or right, on a given day, for the amount of money so received of *Gray, Macmurdo & Co.*, and a stipulated amount of commission and interests, of receiving back the paper so transferred. When this paper passed from my hands into those of *Mr. Bell*, there was a tacit understanding, as in former transactions, that *Partee & Co.* had the right of reclaiming the same; *Gray, Macmurdo & Co.* sent, after the stipulated time for paying the amount, to ask of *Partee & Co.*, if the money stipulated was to be paid. In the previous transactions which *W. B. Partee & Co.* had had with *Gray, Macmurdo & Co.*, a sale had been drawn and signed; it was, as I understood, a similar sale which *Gray, Macmurdo & Co.* desired should be signed; if the signature to that paper had been asked, at the time of making the loan, it would most unquestionably have been given; as near as my memory serves me, it was in the beginning of October, that a call was made on me for the signature of such a paper; it was perhaps ten days or two weeks after the time the money for the purchase was to have been returned, that the call was made on me for the signing of the paper; I did not sign the paper at the time the draft sued on was given to *Gray, Macmurdo & Co.* I received money from them, and the paper was to be returned in about five or seven days after, on the payment of the amount advanced, and with the commission and interest; when this paper, the draft sued on, was taken to *Gray, Macmurdo & Co.*, the understanding was either expressed or implied, that the paper was to be returned to *Partee & Co.*, in five or seven days, on the amount being repaid," &c.

On being examined by the defendants, he stated: "The first transaction between the parties, took place on the 28th of August, at which time $7500 were received by *Partee & Co.* This sum was returned on the 1st of Septem-

ber; there was a written condition of the sale of the paper, made to them; on the 2d September, there was the same kind of transaction made with them, and $4500 received, and this was returned on the 6th September; on the 6th September, there was the same amount, $4500, received of *Gray, Macmurdo & Co.;* that was returned on the 12th September; on the 8th September, there was another similar transaction, in which $7500 was received, and returned on the 9th September; on the 10th September, there was another transaction of $9000, which has never yet been returned; on the 15th September, there was a similar transaction, and $8800 received, which was returned on the next day, the 16th September; on the 16th, there was another transaction of $4000, which was returned on the 20th September; on the 18th September, there was another amount of $6000, which has never yet been returned to *Gray, Macmurdo & Co.;* that for the two amounts of $9000 and $6000, above referred to, *Gray, Macmurdo & Co.*, had the paper which figures on the bilan of *Partee.* When the money was returned, the paper which had been placed in *Gray, Macmurdo & Co.'s* hands, was returned to *Partee & Co.*

The bills receivable, retained by *Gray, Macmurdo & Co.*, on the two advances of $9000 and $6000, are the following," &c.

*William Bell*, a witness for the plaintiffs, makes this statement: "I heard *Mr. Greenland* give his testimony in this case." Being shown the bill sued on, says: "It belongs to *Gray, Macmurdo & Co.;* I bought the same for them sometime in September last, from *Mr. Greenland;* I had several transactions with *Greenland*, wherein I bought certain paper from him, with the understanding, that he was to redeem them within a given time, from five to seven days; but, in no case, to exceed seven days; in two of those transactions, *Greenland* failed to redeem the paper; this note sued on was in one of those purchases; the note in question was purchased by myself; I attend to the business of *Gray, Macmurdo & Co.*, generally, and hold their power of attorney; none of the members of said firm were present at said transaction, and I think none of them were in town; I am not certain but that *Macmurdo* was in town; but my impression is, that none of them were; when this paper was purchased, there was a time fixed within which it was to be redeemed; I cannot say the precise number of days which were fixed, within which this paper was to be redeemed, because the mode of fixing the day was not by the number of days, but by fixing a day in the week, or a day in the next succeeding week; the mode fixed by *Greenland* was on such a day of the week, or the next succeeding week; in no instance did the time fixed exceed one week; in this case, I am confident, that the time fixed did not exceed one week; *Mr. Greenland* did not offer to redeem this paper within the time, or tender the money.

Being shown the description of the bills in the petition of *Lowe* and *Pattison* v. *Partee & Co. et al.*, and asked whether they are the bills which were acquired by *Gray, Macmurdo & Co.*, in the same manner as the one sued on, says "they were; cannot say, that they were acquired at the same time as the one sued on; but they were acquired at one of the two times alluded to, and in the same manner; about the day, or two days after the time fixed for the redemption of this paper, I think on the 24th or 25th of September, I called on *Mr. Greenland*, and told him, that I did not want the paper; that if he, *Greenland*, would give me $15,375, that he might have the paper back. *Mr. Greenland's* reply was, that he knew he had no right to the paper, that he felt aware,

GRAY
*v.*
LOWE.

that it was a favor which I was rendering him, but that if he could get the money that day, he would redeem the paper.

" *Mr. Greenland* never did give me the $15,375. As far as I had any knowledge, *Mr. Greenland* generally did all the business and financial transactions of *W. B. Partee & Co.*, and even when *Partee* was here, *Greenland* came to borrow money of *Gray, Macmurdo & Co.*; I do not know that *Greenland* got any money when *Partee* was here.

" After *Mr. Partee* returned from the north, he never made any objection, to my knowledge, to plaintiffs, *Gray, Macmurdo, & Co.*, to hold the paper, or to *Greenland's* authority to transfer it to them; I am still doing business for *Gray, Macmurdo & Co.*; from my position in their house, had *Gray, Macmurdo & Co.*, made any such objections, I think it very likely that I should have heard of it; I did not understand the transaction to be a loan, with the paper left as collateral security; I would not have made a loan on a pledge of the paper as collateral security; on the first transaction with *Greenland*, *Mr. Macmurdo* consulted me about the matter, and I told him, that a loan on pledge of paper would not be legal, and that he must have a sale of the paper; I drew up the original sale of the paper on said first transaction, and I acted on all subsequent transactions, with *Greenland*, on the same footing as the first transaction; on the two transactions, in which the paper was not redeemed, I gave, on one occasion, $9000, and on the other, $6000, and the amount of paper received was something over $20,000."

Cross-examined.  " I had a general power from *Gray, Macmurdo & Co.*, for all intents and purposes; it was written; I had no special power; the members of the firm, are *Mr. Gray* and *Mr. Macmurdo*, and no one else; when I got this draft sued on, I cannot say what other paper I got with it, but I can tell what paper we got for the two transactions together."

Being shown the schedule of *Partee & Co.*, says : " The paper put down on the schedule of *Partee & Co.*, as being in the hands of *Gray, Macmurdo & Co.*, is the paper which *Gray, Macmurdo & Co.*, held under the two transactions spoken of; the dates of the maturity of the paper, I believe, to be correctly stated; of said papers, there has been actually paid $3376 75; two of the papers have been sold, to wit, that belonging to the church, of $1038 83, and $1080 64; the rest of the paper they still hold; I am unable to say what I did give for this $5000 draft; I cannot distinguish what particular paper I received at the two particular transactions; when I called on *Greenland* and told him he could have the paper by paying $15,375, *Partee* had not returned to the city; cannot say if, at that time, it was generally known here, that *Partee* had failed; that fact became generally known here, sometime in the latter part of September; *Gray, Macmurdo & Co.* never lent *Partee* money since I have been there; I know that they refused to lend money; there was no broker employed in this transaction; on these transactions, the charge was generally one per cent commission; in case the money was returned, it was understood, that *Greenland* had to pay one per cent commission in addition to the amount obtained; *Messrs. Gray, Macmurdo & Co.*, never censured me for taking this paper in any way.  The objection which I had to lending money on a pledge, was because it required an act to be made before a notary; this was the reason why I took a verbal sale of the paper in the last transactions; I would have taken a written sale, but stopped, at *Greenland's* solicitation, that he was in a hurry for the money."

Re-examined. "I have been in business with *Gray, Macmurdo & Co.*, since the 19th May last; the consequence was, that if the paper was not redeemed within the time fixed, the paper belonged to *Gray, Macmurdo & Co.*; such was the understanding. *S. B. Conrey* has failed."

*William Bell*, re-called by plaintiffs, *Gray, Macmurdo & Co.*, says : " *Messrs. Lowe, Pattison & Co.*, have failed ; that is, they have suspended payment ; I received the paper in this transaction, and am acquainted with its character ; I consider, that *Gray, Macmurdo & Co.*, gave a fair price for said paper, and the reason why I think the price a fair one, was because, when I tried to get the paper off, I could not get for it, what *Gray, Macmurdo & Co.* gave for it; I offered the greater part of the paper for sale, in the latter part of September ; about the 26th of said month, I offered *Lowe* and *Pattison's* and *John Williams'* paper then." The evidence given by the witness on the 20th inst., being read to him, he desires to correct that portion of it which says : " the objection which I had to lending money on a pledge, was because it required an act to be made before a notary ; this was the reason why I took a verbal sale of the paper, in the last transaction, by stating, that the two alternatives of a loan or pledge, were not presented to me ; the only offer made to me was a sale ; if the other alternative of a loan or pledge had been offered, I would have refused."

The district judge was of opinion, that the testimony of these witnesses established the fact of two sales of notes, of which the price of one was $9000, and of the other, $6000 ; that a day for the redemption was fixed by each of the contracts ; that the delay expired without the bills having been redeemed. But he was not satisfied that, under the evidence, the legality of the sale of the draft could be sustained. His reasons are thus given at length :

"But here commences the difficulty. The sale of the 10th of September, became irrevocable on the 15th, or, at the farthest, on the 17th of September, according to both the witnesses ; consequently, before the contract of the 18th was made, that of the 10th was consummated, by the default of the seller, to the advantage of the purchaser. It follows, that the bills which constituted the object of the first *vente à rémèré* on the 10th of September, could not possibly constitute the object of the second *vente à rémèré* on the 18th of September, because *Partee & Co.* could not possibly sell to *Gray, Macmardo & Co.*, that which already belonged, by an absolute title, to *Gray, Macmurdo & Co.*

" Now, both the witnesses, *Greenland* and *Bell*, declare, that the list of notes and accepted drafts given in evidence, as put down among the assets of *W. B. Partee & Co.* upon their schedule, and amounting to a nominal value of twenty thousand dollars and upwards, is a correct list of notes and drafts transferred to *Gray, Macmurdo & Co.* by *Partee & Co.*, by the two contracts of the 10th and 18th of September ; but both these witnesses are unable to specify which of the said notes and drafts were delivered to *Gray, Macmurdo & Co.*, on the 10th, and which on the 18th September. In other words, these witnesses have failed to specify what was the thing sold on the 10th of September, and what was the thing sold on the 18th of September. They agree in declaring that the draft now sued upon, was included in one or the other of those transactions or contracts, but they are unable to say, which. But, for the reason already stated, it is impossible that this draft was included in both of the contracts, considering those contracts as sales with the clause of redemption.

"The price of the first of the sales in question was $9000; that of the second was $6000.

"The evidence leaves it entirely uncertain to which of those sales the draft now in suit belongs. We have, therefore, no proof what price was given for it, or for any of the bills receivable contained in the list above mentioned.

"I am fully impressed with the truth of the argument used by the counsel of *Gray, Macmurdo & Co.*, that a sale of a flock of one hundred sheep for one hundred dollars, is good, without any specification of how much is given for every particular ram, 'wether and ewe in the flock. But, at least, the flock must be susceptible of identification; unless so, I must say, that such a sale could not be carried into effect, and would be, to all practical purposes, void. In like manner, *Lowe* and *Pattison's* acceptance for $5000 belonged to a batch of bills receivable, sold by *Partee & Co.* to *Gray, Macmurdo & Co.*, on the 10th of September, for $9000, or it belonged to another batch, sold by the same vendors, to the same vendees, on the 18th September, for $6000. But, the agents of the vendors and of the vendees, in making the two sales, are alike unable to identify the paper sold at either sale; and, consequently, to identify whether this draft was included in the first or last sale. It appears to me a confusion of ideas, to blend the two contracts, and to say that, because the whole price of the two sales was $15,000, and because all the bills and notes on *Partee's* schedule are embraced in those two sales, that therefore the title of *Gray, Macmurdo & Co.* to each and every bill and note in that schedule is made out. To elucidate my idea: suppose that *Partee & Co.* had presented themselves, on the 20th of September, to *Gray, Macmurdo & Co.* with $6000, (and one per cent added,) in hand, demanding the return of his acceptance of *Lowe* and *Pattison*, as returnable under the contract of the 18th of September. And suppose, upon such a demand, that *Gray, Macmurdo & Co.* had refused to re-deliver the said acceptance, on the ground that it was absolutely their property, under the contract of the 10th of September. Who can say, under the evidence, which would have been right? The fact is, that the two contracts were so distinct, that one was consummated before the negotiation for the other was commenced.

"I decide, for the foregoing reasons, that *Gray, Macmurdo & Co.* have failed to establish their title to the accepted draft sued upon, by failing to identify the contract by which the draft was transferred to them by *W. B. Partee & Co.*

The transactions of the 10th and 18th of September, being conceded by the learned judge to be sales, and valid transfers of the things sold, in each case, does it follow, because the witnesses cannot swear as to which of the batches or parcels this draft was included in, that, therefore, it can be sustained as a legal inference, that the object of either was uncertain? As the witnesses concur in stating the draft to have been included in one or the other of the sales, the conclusion is excluded, that it was included in both. We understand the testimony as establishing the verity of each transaction at the dates of the 10th and the 18th, as distinct and separate from the other; and that the price of one was sale $9000, and the other, $6000. As to which of these sales the draft formed a part of the objects, the recollection of the witnesses is at fault; but that it formed a part of one or the other, that it was bought on one or the other of those days, the testimony appears positive.

Had *Partee & Co.*, as in the case supposed by the learned judge, presented themselves, and offered to redeem this draft, within the time of redemption, and demanded the redemption, under the contract of the 18th of September, and

*Gray, Macmurdo & Co.* had insisted on retaining it, under the contract of the 10th of September, and, had the witnesses to the transaction testified as they do now, it is true, that the embarrassment in ascertaining by which of the contracts the draft was sold, would arise. But our impression is, that we are not justified by the evidence in assuming that such a state of things could have occurred.

As the draft was included in one or the other of the parcels, the matter being fresh in the minds of those who had been occupied about it, it is hardly probable that the parties could not have known exactly how it occurred ; and even if the fact was left doubtful, as to which of the parcels the draft belonged, the sale of it would not be invalidated, when it was certain that it was included in one or the other of the parcels. The seller would be embarrassed in exercising his right of redemption, from the slovenly manner in which he did his business ; but the right to hold the objects sold, would not be affected by this irregularity.

Ambiguous or obscure clauses in the contract of sale, are interpreted against the seller, who is bound to explain himself clearly as to the extent of his obligations. Code 2449.

This rule may not be strictly applicable to the present case ; but, when we look at the haste which attended those transactions, the irregular mode in which the business was done, the condition of *Partee's* house, which was already seriously embarrassed on the 18th, if we cannot fix illegality upon the transaction, we must recognize it as valid, or defeat all contracts made by such people, who do their business irregularly and under such circumstances. When notes have been fairly sold, in parcels or batches, at two different times, and the price paid for them, it would certainly not be just that the sale of all should be defeated, by the vendor's not being able to establish his right of redemption to any particular object.

We, therefore, are not able to concur in the conclusion of the district judge, that the plaintiffs have not made out their right to the draft in question, by reason of their failing to identify by which of the contracts they acquired it. It being conceded, that they acquired it by one or another contract, this uncertainty in the testimony, we do not conceive defeats their title.

The plaintiffs' case being relieved from this objection, we have before us the sale of a draft, with the privilege reserved to the seller to redeem it within a certain time, and a failure to redeem [it. It was purchased at a fair market price, and the plaintiffs gained no undue advantage by their bargain.

The principal argument of the counsel for the plaintiffs is, to show that a loan of money was contemplated by the parties, and that these transactions, taken together, amount to nothing more than the giving the notes as collateral security for the payment of the loan.

The object of *Partee & Co.* unquestionably was, to raise money by the notes which they delivered to the plaintiffs ; but the evidence, we think, is conclusive, that they were not pledged, but sold, with a privilege of redemption ; and that the property in them passed to the purchaser, and would revest in the seller on their redemption. The contract of pledge was known to both parties as unavailable for their urgent purposes ; and the contract of sale was that which alone would give the plaintiffs the equivalent which they asked for the advance of their money, and which *Partee & Co.* had agreed to provide, as they had provided in other similar cases.

An inference from the testimony of the witnesses is attempted to be deduced, that the books of *Gray, Macmurdo & Co.* contain no entry of this draft among

<div style="margin-left"></div>

GRAY
*v.*
LOWE.

their bills receivable, nor of the price or consideration given for it. The books of the plaintiffs would not have been admissible as evidence for them. If the defendants wanted to use them, they aught to have asked for their production, and sought to establish by certainty, what is now a matter left to conjecture. The witness *Bell*, had he been interrogated on this subject, could have stated the fact thus inferred, and would have had an opportunity of giving explanations in reference to it. It would not be just to suffer an inference of this kind to weaken the validity of clearly established rights.

Upon the whole, we consider the defence quite untenable. If maintained, it would establish a precedent which would operate a check upon a free and fair circulation of negotiable paper, and be an innovation of the law as well as of the usages of trade in that article.

The judgment must be reversed.

It is therefore ordered, adjudged and decreed, that the judgment of the court below, in these two cases, be reversed, and that the defendants, *Bartley M. Lowe* and *William H. Pattison*, composing the firm of *Lowe* and *Pattison*, and *Alexander Pattison*, be condemned, *in solido*, to pay the plaintiffs, *Gray, Macmurdo & Co.*, the sum of five thousand two hundred and fifty-four dollars, being the amount of the protested draft, with damages at five per cent, and costs of protest, with interest at the rate of five per cent, from the 14th day of November, 1851, till paid. It is further ordered and decreed, that there be judgment against the firm of *Lowe* and *Pattison*, and the firm of *Lowe, Pattison & Co.*, in their suit for injunction, and the injunction granted therein is hereby dissolved. It is further ordered and decreed, that the said *Gray, Macmurdo & Co.* are the lawful owners of the said paper, the negotiation of which was enjoined by the said *Lowe* and *Pattison*, and *Lowe, Pattison & Co.*, and that judgment be rendered thereon in favor of said *Gray, Macmurdo & Co.* And it is further ordered and decreed, that there be judgment against *W. B. Partee*, on his intervention as syndic of the creditors of *W. B. Partee & Co.*, and that the same be dismissed, at his costs, and that all the other costs of these suits be paid by the said *Lowe* and *Pattison*, and *Lowe, Pattison & Co.*

Application for a re-hearing refused.